**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
JOAN LOVELL,

                       Plaintiff,

      - against -

COMSEWOGUE SCHOOL DISTRICT and
JOSEPH RELLA, in his Official Capacity,
                       Defendants.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**

CV 01-7750 (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Defendants Comsewogue School District (the "District") and Joseph Rella ("Rella") seek summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56 on all of the claims brought by plaintiff Joan Lovell ("Lovell") based on allegations that she was subjected to a hostile work environment on the basis of her sexual orientation and that the district retaliated against her for speaking out against such discrimination, all in violation of 42 U.S.C. § 1983. *See* Docket Entry ("DE") 65. For the reasons set forth below, the motion is moot with respect to the retaliation claim (which Lovell has withdrawn), granted with respect to any claim against Rella based on his alleged failure to protect Lovell against the creation by students of a hostile work environment, and denied in all other respects.

I.      <u>Background</u>

      A.      <u>Factual Background</u>

      This case arises out of the defendants' handling of various incidents involving Lovell at Comsewogue High School ("CHS" or the "School") in 2001. The District has employed Lovell as a full-time art teacher for more than 27 years. Prior to February 8, 2001, Lovell did not make any statements regarding her sexual orientation to any individual within the District. Rella

became principal of the Comsewogue High School ("CHS" or the "School") on July 1, 1998. D. Stmt. ¶¶ 1-2.[1]

### 1. The Initial Incident In Early February 2001

On February 6, 2001, a CHS assistant principal gave a pass to a female student in Lovell's art class. The next day, February 7, 2001, Lovell rejected the pass when the student arrived late to her class. At 2:30 p.m., the student's mother spoke by telephone with another CHS assistant principal named Diane Youngblood ("Youngblood"), and reported that her daughter was upset because Lovell looked at her in a sexual manner. Youngblood scheduled a meeting with the student and her mother for the following morning. Following the conversation, Youngblood (who suspected Lovell's sexual orientation was homosexual) described it to the colleague who had issued the pass as well as to Rella, the CHS principal. D. Stmt. ¶¶ 3-7; P. Stmt. ¶¶ 6, 30; Opposition Ex. 7 ("Youngblood Dep.") at 47, Opposition Ex. 1 ("Lovell Dep.") at 35.

At the meeting on the morning of February 8, 2001, the mother told Youngblood that there were two other students who also felt uncomfortable. Youngblood then spoke to the two other students, one of whom said that she also was upset and did not want to be in Lovell's class. The three students all claimed that they experienced Lovell looking at them in a sexual manner or saw Lovell looking at one of their friends. D. Stmt. ¶¶ 8, 10-11, 13-14; P. Stmt. ¶¶ 7-8.

---

[1] Except where noted, the following factual recitation is taken from the undisputed assertions in the defendants' Statement of Material Fact submitted pursuant to Local Rule 56.1 ("D. Stmt."), annexed to the Notice of Motion ("Motion") which forms part of DE 65. Other materials cited in the following recitation include Plaintiffs' Rule 56.1 Statement and Controverted Statement of Undisputed Fact in Opposition to Defendants' Motion for Summary Judgment ("P. Stmt"), annexed to Plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment ("Opposition"), as well as various exhibits to the Opposition.

Youngblood relayed this information to Rella. As she did so, Lovell, together with her union's president Christine Pendergast ("Pendergast"), appeared in the doorway of Youngblood's office, apparently because Lovell was scheduled to meet with Rella regarding her rejection of the student pass. At that point, Lovell did not yet know of the students' accusations. Rella advised Lovell and Pendergast of the latter at an afternoon meeting later that same day. D. Stmt. ¶¶ 12, 13, 18; P. Stmt. ¶¶ 7,8.

Thereafter, Rella investigated the accusations, interviewed the students who made the allegations, and, by letter dated February 28, 2001, advised Lovell that the accusations were unfounded. The students who had made the accusations were transferred out of Lovell's class. Lovell and Rella disagreed over further disciplinary action. In a letter dated February 28, 2001, Lovell said she wanted them suspended and a letter put into their files, and also said that the student body should be addressed in small groups to clear her name. Rella, however, said that he believed the students had reported what they genuinely felt and decided that it would be inappropriate to impose any discipline under the circumstances. The students were not punished. Rella gave one of them a grade of 100% in art class for the school year's third quarter; previously, the student received a grade of 65% in the first quarter and 25% in the second quarter. D. Stmt. ¶¶ 15-19, 25; Motion Exs. L-M; Rella Aff. ¶ 4

Lovell's union later brought a grievance against the District, claiming that Rella did not "promptly" advise Lovell of the student's accusations. The arbitrator found that the District did not promptly report the February 7 complaint to Lovell, as required under the District's Sexual Harassment Policy. D. Stmt. ¶¶ 22-24; *see* Motion Ex. I (Policy Regarding Sexual Harassment of Students by Employees); Motion Ex. Q (Arbitrator's Findings dated August 2, 2002).

### 2. Subsequent Incidents In February and March 2001

On March 12, 2001, Lovell submitted Student Behavioral Referral Slips chronicling three more incidents. The first occurred on February 12, 2001: Lovell said that as she was walking through the school cafeteria, a girl looked at her and called her disgusting. In the second incident, on February 26, 2001, Lovell stated that a group of students (including two involved in the initial complaint) passed Lovell and yelled "what did you say about her," pointed, whispered and stared at the teacher. The third incident, which occurred on the same day Lovell submitted the referral slips, March 12, 2001, involved the same two students who had been involved in both the preceding incident and the initial one: Lovell reported that the two students stared at her as she passed them, hugged each other and laughed. D. Stmt. ¶¶ 29-31; Motion Ex. N.

There is conflicting testimony as to whether Rella took any action regarding Lovell's Student Behavioral Referral Slips. Rella said that he investigated the February 26 and March 12, 2001 events and spoke about that investigation with Lovell. However, one accused student testified that she did not speak with Rella, another testified that she did not remember having spoken with him, and Lovell apparently claims that Rella did not speak to her regarding his investigation. Motion Ex. G at 20-22; Opposition Ex. 6 at 25; Opposition Ex. 9 at 17-18.

### 3. The Lawsuit And Subsequent Incidents

On November 19, 2001, Lovell filed her initial complaint in this action against the District and Rella. DE 1. Shortly thereafter, on November 28, 2001, two female students went up to Lovell's desk and asked about her dating habits and whether she was a "dyke." The next day, Rella met with the students in the class, discussed the incident with them, and then instructed them not to talk about it. As a result of the investigation, the students involved in this

incident were given the maximum five-day out-of-school suspension and were required to write letters of apology to Lovell. D. Stmt. ¶¶ 32-35.

On March 5, 2002, Lovell told a male student whom she had often reprimanded to sit down; he responded by calling Lovell a racist. Lovell told the student to go to the school office, and the student said, "Oh you just hate men." Youngblood interviewed the student. She reported that the student had no idea what he was saying in calling Lovell a racist and admitted saying that Lovell hated men. In a letter to Lovell dated April 9, 2002, Rella concluded that the latter comment "was not directed towards anyone's sexual orientation" but instead was meant to suggest that Lovell's "disciplinary posture towards male students is stricter than towards female students...." Rella continued, "While I am not in any way embracing this students explanation, it did not appear that the statement was made in the context of sexual harassment." D. Stmt. ¶¶ 36-38; Motion Ex. P.

As the instant case continued, it drew some media attention: *Newsday* published an article about the case on October 1, 2002, and Lovell was also interviewed for a segment on a local news broadcast. D. Stmt. ¶ 39; Motion Ex. R.

On February 27, 2003, Lovell reported a further incident: she said that she had found a work area on which someone had written, "Lovell is a stupid dyke." Rella examined the graffito and said that he would call the Bias Crime Unit of the Suffolk County Police Department. He interviewed five students whose desks were near the area, and compared these students' handwriting to the writing on the worktable. No one saw the person write the statement on the worktable. Police officers from the Bias Crime Unit interviewed the students in the classroom.

The identity of the person who wrote the statement was never determined. D. Stmt. ¶¶ 40-43; Motion Ex. E 132-33; Motion Ex. O.

Two weeks later, on March 13, 2003, a male student accused Lovell of telling him to go home and commit suicide. Rella interviewed the student the next day. Thereafter, students approached Lovell and said, "I heard you are fired for telling a kid to commit suicide." Apparently upon hearing this, Lovell informed Rella that she would not be returning to work; Lovell has not returned to work since then. Ultimately, Lovell was exonerated: Rella found that the student did not tell the truth and fabricated (or took out of context) Lovell's statement. The student received a five-day out-of-school suspension. D. Stmt. ¶¶ 47-52; Motion Ex. S.

### 4. Incidents Involving Others

Lovell compares the way the defendants responded to the incidents described above with separate incidents involving others in the District:

- Sometime between 1996 and 2001, the word "nigger" appeared on the blackboard in the classroom of a junior high school teacher within the District. The District Superintendent addressed the faculty within the building regarding this incident. D. Stmt. ¶ 53.

- On another occasion, the words "Youngblood is a niger [sic]" were found written on the football bleachers. *Id*., ¶ 54. Rella's predecessor called the Bias Crime Unit, which conducted an investigation but never determined the author's identity. S. Stmt. ¶ 54; P. Stmt. ¶ 35.

- Rella's predecessor also called upon the Bias Crime Unit to investigate when he learned that swastikas had been drawn on the School building. P. Stmt. ¶ 39.

### 5. Lovell's Catastrophic Leave And Salary Reduction

On March 31, 2003, Lovell requested catastrophic leave. Pursuant from a direction from District Superintendent Richard Brande ("Brande"), Lovell submitted to an examination by

School physician Dr. Harold Joseph ("Joseph"). Based on his examination, Joseph opined that Lovell's condition of "adjustment disorder with mixed anxiety and depressed mood," made it inadvisable for Lovell to return to work. Brande then granted Lovell's request for catastrophic leave, subject to an expectation that she would return to work in September 2003. D. Stmt. ¶¶ 55- 57; Motion Exs. T-V.

On July 15, 2003, Lovell's psychiatrist Dr. Joan Rubinstein ("Rubinstein"), noting that her patient suffered from "Post-Traumatic Stress Disorder resulting from numerous incidents of harassment at work related to her sexual orientation," advised Brande that Lovell would not be returning to work for the 2003-2004 school year. Lovell asserts that she was told by her union representative Fran DiPiazza that Brande described Rubinstein's letter as "political." She further asserts that Brande required her to call in sick on a daily basis while her request to extend the catastrophic leave was pending (a requirement she says was not imposed on other teachers on catastrophic leave), and further required her to submit to a new examination by a psychiatrist to be chosen by Dr. Joseph. Lovell submitted to that examination, and the psychiatrist who conducted it reported his evaluation to Dr. Joseph – although not before Lovell's attorney wrote letters, on September 23 and October 22, 2003, inquiring as to the status of Lovell's request and requesting a copy of the psychiatrist's report. Based on that report, Joseph recommended that Lovell's catastrophic leave be extended, and Brande acceded to the recommendation on November 4, 2003. D. Stmt. ¶¶ 58-59; Motion Exs. W-X; P. Stmt. ¶¶ 55-67, Opposition Exs. 15, 19.

On June 30, 2003 – after Lovell was initially approved for catastrophic leave but before she requested its extension – the collective bargaining agreement between the teachers and the

District expired. D. Stmt. ¶ 61. On November 17, 2003 – after Brande granted Lovell an extension of catastrophic leave – the teachers and the District entered into a new agreement that, among other things, amended the provisions related to catastrophic leave. The amendments lengthened the waiting period prior to the commencement of catastrophic leave from 40 days to 50 days and reduced the salary paid to a teacher on catastrophic leave from full salary to 85% of full salary. D. Stmt. ¶¶ 61-62; Motion Exs. Y-Z.

These amendments affected Lovell and three other teachers, and produced a disagreement about how the changes would operate with respect to those on catastrophic leave prior to the changes. The teachers' association believed that teachers on catastrophic leave prior to the amendments were not affected; the District thought otherwise. D. Stmt. ¶¶ 63-66.

The parties to the agreement eventually resolved the matter by deciding, on November 22, 2004, that "teachers on catastrophic sick leave as of November 17, 2003 will be compensated at a rate of 100% of the salary plus step, if applicable, such salary to be prorated and based on the 2002-2003 salary schedule. After November 17, 2003, teachers on catastrophic leave shall be compensated at 85% of the then applicable salary schedule...." Motion Ex. AA, D. Stmt. ¶ 67.

There was some uncertainty in the record as to how that agreement affected Lovell as compared to other teachers on catastrophic leave. The defendants claimed that the terms of the 2004 agreement were equally applied to all teachers on catastrophic sick leave as of November 17, 2003. *See* D. Stmt. ¶¶ 64, 68. Lovell admitted those assertions by the defendants, *see* Plaintiff's Rule 56.1 Statement ¶¶ 64, 68, but on the other hand asserts that Lovell's salary was reduced to 85% and that this reduction caused her to suffer, unlike her similarly situated colleagues, a permanent harm to her pension amount. P. Stmt. ¶¶ 72-73.

At oral argument on the motion on June 13, 2005, I asked further about the latter issue. The defendants' counsel asserted that for approximately a year prior to the November 2004 agreement, Lovell did indeed receive only 85% of her salary, but insisted that once the latter agreement was in place, Lovell received a retroactive payment to account for the 100% of salary she should have received. Counsel could cite no documentary support for the assertion other than the affidavit of Susan Casali, submitted as part of DE 65 – which does not say anything about the retroactive payment. On the other hand, Lovell's counsel denied that such a payment had been made, and asserted that his client only received the 85% pay. Counsel did not have the motion papers with him at the time, but agreed to supplement his submission with a citation to evidence in the record that would support his claim. After further review of the records, counsel agreed that Lovell had received the retroactive payment. *See* DE 70.

B. <u>Lovell's Claims</u>

Although the amended complaint is not a model of clarity, it appears to have three basic components. First, Lovell claims that she was not treated similarly compared to other teachers on account of her sexual orientation because defendants did not follow the District's Sexual Harassment Policy regarding the February 7, 2001 incident and did not discipline the students involved after it was determined that the allegations were false. Second, Lovell claims that she was subjected to a hostile work environment because no investigation or disciplinary action resulted from her reports of March 12, 2001, about further incidents with students at CHS. Finally, Lovell claims that the District retaliated against her by delaying a determination of her request to extend her catastrophic leave, which caused a reduction in Lovell's pay and pension benefits. *See* DE 49. Although the Amended Complaint nowhere characterizes the latter

assertion explicitly as a claim of retaliation for opposing discrimination, the parties have treated it as such. *See*, *e.g.*, Defendants' Memorandum of Law in Support of Motion for Summary Judgment, submitted as part of DE 65 ("D. Memo"), at 23; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, submitted as part of DE 65 ("P. Memo"), at 13-14.

      C.      <u>The Decision On The Motion To Dismiss</u>

Soon after Lovell filed her initial complaint, the defendants moved to dismiss it, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that it failed to state an Equal Protection claim, that it failed to allege a sufficient policy practice or custom to support Section 1983 liability against the District, and that Rella was shielded by qualified immunity. *See* DE 4; *Lovell v. Comsewogue School District*, 214 F. Supp.2d 319 (E.D.N.Y. 2002). The Honorable Arthur D. Spatt, United States District Judge, denied the motion in its entirety.

With respect to the Equal Protection claim, Judge Spatt ruled that the complaint sufficiently alleged that the defendants handled the complaints against Lovell and complaints of sexual harassment against non-homosexual teachers differently. He further ruled that the incidents involving racial epithets against others that Lovell cited were sufficiently similar for Lovell to rely on them in claiming that she was subjected to a hostile work environment on account of her sexual orientation. Whether the various incidents could be considered similar was ultimately, the court ruled, a question of fact for the jury to resolve. *Lovell*, 214 F. Supp.2d at 322-23. The court also rejected the defendants' assertion that Lovell's sexual orientation was not an impermissible consideration upon which to take employment actions (an argument that they now appear to have abandoned). *See id.* at 323. Finally, Judge Spatt declined to rule on the

-10-

assertion that the case should be dismissed because Rella's actions were reasonable, noting that such an argument was not properly before the court on a motion to dismiss. *Id*.

In addressing the District's contention that Lovell failed to allege that the discriminatory conduct was pursuant to a policy or custom, Judge Spatt noted that such a claim could proceed if, with respect to the challenged conduct, Rella was responsible under state law for making policy in that area of the District's business. *Id*. at 324 (citations omitted). Following a decision in a prior federal case that New York law gave a school principal such as Rella such authority, Judge Spatt declined to dismiss the claim against the District. *Id*. (citing *Rabideau v. Beekmantown Central Sch. Dist.*, 89 F. Supp.2d 263, 269 (N.D.N.Y. 2000)).

Finally, Judge Spatt rejected Rella's assertion of qualified immunity – which he noted had been made "[i]n two sentences" – on the ground that Lovell's constitutional right to be free of discrimination based on her sexual orientation had been established with sufficient clarity for purposes of a Section 1983 claim by the time of the events at issue. *See id*. The court did not then address, apparently because the defendants did not then raise, the question whether Lovell had a clearly established right to be protected by her employer against sexual orientation-based harassment from her students – a question which, as discussed below, is now before me.

D. The Defendants' Motion For Summary Judgment

Now that discovery is complete, the defendants seek once again to dismiss the case, this time pursuant to Federal Rule of Civil Procedure 56. In doing so, they raise several arguments: (1) that they did not violate Lovell's right to Equal Protection with respect to the early February 2001 incident; (2) that Lovell cannot establish a hostile work environment claim; (3) that even if Lovell was subjected to a hostile work environment claim exists, that fact is not properly

attributable to defendants; (4) that Rella is entitled to qualified immunity; (5) that Lovell cannot establish a *Monell* claim against the District; and (6) that Lovell cannot establish a claim of discrimination or retaliation based in relation to her catastrophic leave and salary reduction. Lovell disagrees on all points.

II.     Discussion

    A.     Summary Judgment Standard

When deciding motions for summary judgment, a court does not "'weigh the evidence and resolve factual issues'"; instead, it "'determine[s] as a threshold matter whether there are genuine issues of material fact to be tried.'" *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir. 1991) (quoting *Gibson v. American Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see* Fed. R. Civ. P. 56(c). A fact is material if it "'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F. 3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue is presented if "'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Id*. However, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assoc. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citations omitted). "The trial court's function at [the summary judgment] stage is to identify issues to be tried, not decide them." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). Finally, "[s]ummary judgment is sparingly used where intent and state of mind are at issue . . . because as [the Circuit has] emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Id.* (citations omitted); *see Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005) (citing *Graham*).

B. The Law of the Case Doctrine

A "decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir. 1991) (citations omitted). I am therefore bound by the law of the case doctrine to conform to Judge Spatt's legal rulings on the issues before him on the Rule 12(b)(6) motion.

C. Lovell's Claims Under Section 1983

Section 1983 states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. The elements of a § 1983 claim are: "(1) that the challenged conduct was attributable at least in part to a person acting under color of state law; and (2) that such conduct deprived the plaintiff of rights ... secured by the Constitution or ... laws of the United States." *Tekula v. Bayport-Blue Point Sch. Dist.*, 295 F.Supp.2d 224, 232 (E.D.N.Y. 2003) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)). The instant motion turns on the second element.

1. Equal Protection Clause

The Equal Protection clause of the Fourteenth Amendment provides that "[no State shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. This is a direction that all persons similarly situated be treated alike. *Harlen Assoc.*, 273 F.3d at 499 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To state an Equal Protection claim, Lovell must show that she was treated differently compared with

other similarly situated employees and that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999).

The defendants argue that Lovell is not similarly situated in all material respects to those with whom she would compare herself. The argument, however, is foreclosed by Judge Spatt's earlier ruling. *Lovell*, 214 F. Supp. 2d at 322. Moreover, I agree with that ruling in the context of this motion for summary judgment: whether Lovell's situation is sufficiently similar to others who were harassed by students, whether the defendants' handling of her situation was sufficiently different, and whether the explanation for any such difference is grounded in anti-homosexual animus are all questions that a rational jury might resolve in Lovell's favor. I therefore decline to grant summary judgment on the Equal Protection claim. *See Holtz*, 258 F.3d at 69; *Graham*, 230 F.3d at 38; *Konits*, 394 F.3d at 124.

2.  Hostile Work Environment

The defendants argue that Rella's handling of the incidents Lovell cites cannot support a hostile work environment claim for several reasons: the underlying incidents were not all related to Lovell's sexual orientation; they were not sufficiently severe or pervasive; Rella handled them properly; and that in any event, any hostile environment created by those incidents cannot be attributed to Rella or the District. While such arguments may prevail at trial, they do not suffice for purposes of summary judgment.

To establish a prima facie hostile work environment claim, Lovell must prove that the conduct of which she complains was "'severe or pervasive' enough to result in an environment that would reasonably perceived, and is perceived, as hostile or abusive" and that there is a specific basis exists to impute the objectionable behavior to the defendants. *See Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The requirement of "severe or pervasive" conduct does not mean that only egregious behavior is actionable, but neither do merely mild or isolated incidents of harassment suffice. *Dawson v. County of Westchester*, 373 F.3d 265, 273 (2d Cir. 2004) (citing *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).

The focus is on "whether the harassment is of 'such quality or quantity' as to meet the standard of 'severe or pervasive' harassment or abuse." *Dawson*, 373 F.3d at 273. The ultimate determination of whether an environment is hostile or abusive must be made "looking at all the circumstances," which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance – no single factor is required or dispositive. *Harris*, 510 U.S. at 23.

Under this standard, I cannot preclude the possibility that a properly instructed jury could find in favor of Lovell. There is a factual dispute about whether and how Rella investigated Lovell's Student Referral Slips regarding the incidents on February 26 and March 12, 2001, the focus of Lovell's hostile work environment claim. A reasonable jury might find that Rella acted

reasonably, or that if he did not it was an isolated or mild lapse. But it might also find that Rella persistently condoned, and therefore enabled, a continuous campaign of harassment by some students against Lovell on the basis of her sexual orientation. Such a finding would allow the jury to conclude that there was a hostile environment and that its creation was attributable to Rella – and therefore to the District, *see Lovell*, 214 F. Supp. 2d at 324 – notwithstanding the fact that the harassing behavior originated with the students.

### 3. Claims Based On Lovell's Catastrophic Leave And Salary Reduction

Having reviewed the record further after oral argument on the instant motion, Lovell's counsel agreed that Lovell had received the retroactive payment described by the defendants' counsel, and therefore agreed to withdraw the retaliation claim based on the District's actions with respect to Lovell's catastrophic leave and salary reduction. *See* DE 70. That portion of the motion for summary judgment is therefore moot.

### D. Qualified Immunity

The doctrine of qualified immunity seeks to shield a government official from personal liability for allegedly unlawful actions. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). Personal liability generally turns on the "objective legal reasonableness" of the official's actions. *Id*. at 638. Stated differently, if an official acts with the understanding that his actions violate "clearly established" legal rules, then the official is not protected by qualified immunity and may be subject to personal liability. *Id*. at 638-39. When evaluating a qualified immunity claim a court should consider: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable

defendant official would have understood that his or her acts were unlawful." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 129-30 (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

To the extent that Rella claims qualified immunity because his obligation to protect Lovell from workplace discrimination on the basis of her sexual orientation was not clearly established at the time of the events at issue, his argument is foreclosed by Judge Spatt's earlier ruling to the contrary. *See Lovell*, 214 F. Supp. 2d at 324-25. To the extent that Rella has refined his claim on this motion for summary judgment to assert that his obligation to protect a teacher from such discrimination by non-employee students, he is not foreclosed, as Judge Spatt did not consider the matter.

Rella's argument in this regard is sound. As he correctly notes, in *Peries v. New York City Board of Education*, 2001 WL 1328921 (E.D.N.Y. 2001), the court held that teachers did not have the clearly established right to be protected by their employers against student harassment. Lovell seeks to rely on *Sound Aircraft Services, Inc. v. Town of East Hampton*, 192 F.3d 329 (2d Cir. 1999). But while that case, like *Peries*, identifies the controlling principal that an official has no immunity with respect to violations of clearly established law, it says nothing, unlike *Peries*, of the state of the law with respect to a principal's obligation to protect a teacher from harassment by students. Thus, to the extent Lovell claims that the defendants failed to protect her against a hostile work environment that the students created, Rella is entitled to immunity.

As a result, Lovell may proceed against Rella only with respect to a claim that the defendants themselves – Rella and the District, as opposed to the students – were motivated by

anti-homosexual animus in insufficiently investigating and punishing the students' harassment. If Lovell can prove the it was the defendants' conduct, and not that of the students, that subjected her to discrimination and a hostile work environment, she may recover from Rella, because even if he did not know in 2001 that he had to protect Lovell against the students' discrimination, he is presumed to have known of his obligation not to engage in such discrimination himself.

V. Conclusion

For the reasons set forth above, the motion by defendants Comsewogue School District and Joseph Rella for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is DENIED AS MOOT with respect to Lovell's claims based on her application for extended catastrophic leave and subsequent reduction in salary, GRANTED with respect to any claim against Rella based on his alleged failure to protect Lovell against the creation by students of a hostile work environment, and DENIED in all other respects.

**SO ORDERED.**

Dated: Central Islip, New York
       June 15, 2005

                                              /s/ James Orenstein
                                              JAMES ORENSTEIN
                                              U.S. Magistrate Judge